Drake, Gb. J.,
dissenting:
I regret my inability to concur with, the majority of the court in their judgment in this case. That the claimants have a just claim upon the Government seems to me clear; but it seems to me equally clear that their just claim is not represented by the judgment now directed to be entered. And it also appears to me that a large part of that judgment is made up of matters of which this court has no jurisdiction.
This is a suit upon a contract. In the petition the claimants aver:
“ That in the spring and summer of 1862 they were contractors to furnish the United States Army with beef for the sustenance and support of that portion of the Army constituting and belonging to the mountain department, then under command of Major-General Frémont. That said forces were then in the field, and in pursuit of the enemy, and said supplies of beef were designed to be used by said forces as they moved from point to point.
“Petitioners further represent that said contracts are evidenced by letters, verbal orders, and telegrams. That under said contracts, telegrams, letters, and orders, petitioners delivered to said army 603,361 pounds of beef, of the quality stipulated for, which was received and consumed by said forces, amounting to the sum of $72,916.65, upon which payments have been made amounting to $27,204.32, leaving a balance due petitioners of $45,712.33, which they say is justly due to them, and for which they pray judgment.”
That is the case which the claimants brought into this court *307 for adjudication, a simple case of merchandise sold and delivered.
The defendants pleaded the statute of limitation of six years to the action, and the plea was sustained by this court, and the petition ordered to be dismissed. (7 C. Cls. R., p. 297.)
The claimants appealed to Congress for relief, and procured the passage of an act for their benefit, approved April 15,1872, whereby it was provided, “ That the Court of Claims is authorized and directed to again take up, hear, and pass upon the claim of Battelle & Evans for cattle and beef sold and delivered by them to the United States for the use of the army, in the year 1862, which claim is in suit in said court; and said suit shall be adjudged on its merits, and without respect to the lapse of six years since the cause of action accrued, but within six years since the final decision of the accounting officers thereon.”
Upon this act alone our jurisdiction of the case now rests. Being a private act, it must be strictly construed. — Roberts’ Case, (6 C. Cls. R., p. 84.) And the Supreme Court, in DeGroot v. United States, (5 Wallace, p. 419,) said: “If the Court of Claims has the right to entertain jurisdiction of cases in which the United States is defendant, and to render judgment against that defendant, it is only by virtue of acts of Congress granting such jurisdiction, and it is limited ‘precisely io such cases, both in regard to parties and to the cause of action, as Congress has prescribed.”
This rule of construction confines this court precisely to the cause of action set forth in the suit of the claimants then pending here. Strictly speaking, no suit of the claimants was then pending here; but the Government having gone into the trial of this case, as if it were the one contemplated by the act, I raise no question on that point. But it is to that case, and no other, and to the cause of action therein set forth, and no other, that the acts relates. It is the action for 503,361 pounds of beef of the quality stipulated for, delivered by claimants to and received and consumed by said forces, that the act of April 15,1872, authorizes us " to again take up, hear, and pass upon.”
At the trial, the quantity of beef claimed to have been delivered to those forces, and for which vouchers were issued and payments made to claimants, was found to have been only *308 362,711 pounds, about which there is no controversy. The claimants admit having been paid for that quantity cents per pound, aggregating $27,204.32; but they claim 3 cents per pound additional, on the ground of extra expense, trouble, and risk attending the furnishing of cattle in May and June, 1862, to General Frémont’s army to meet a pressing emergency.
It is in connection with this point that the claimants may have a just claim against the Government. I would be glad to consider and adjudicate it if I could see lawful authority for so doing. • But such authority is not apparent to my mind.
The finding of facts made by the majority of the court thus sets forth the facts in this connection:
“ The beef-cattle delivered to the army of General Frémont were ordered by him on an emergency requiring their immediate delivery, and precluding the. delay of advertisements. And they were delivered by the petitioners on the orders and telegrams above set forth, and the contract thereby made, with the understanding between them and Captain Mackenzie that they should receive a just compensation for extra trouble and expense in procuring an increased number on short notice, as well as increased risks in driving to points not contemplated in the written contract hereinafter specified as annexed and marked ZP
Upon this state of fact a very important question arises in connection with the tenth section of the act of March 2,1861, (12 Stat. L., pp. 214, 220, ch. 84,) which provides as follows :
“That all purchases and contracts for supplies or services, in any of the Departments of the Government, except for personal services, when the public exigencies do not require the immediate delivery of the article or articles, or performance of the service, shall be made by advertising a sufficient time previously for proposals respecting the same. When immediate delivery or performance is required by the public exigency, the articles or service required may be procured by open purchase or contract at the places and in the manner in which such articles are usually bought and sold, or such services engaged between individuals.”
In my judgment, the language of this provision does not admit of Government officers ordering supplies with an understanding between them and the parties from wffiom they are ordered that those parties shall receive a compensation, not *309 specified as to amount or rate, for extra trouble and expense in procuring and forwarding tbe supplies. This is not “ the manner in which articles are usually bought and sold between individuals.” It seems to me that the legislature could not have intended, through this act, to authorize indefinite verbal understandings between public officers and private parties, by which the Government sliould be liable at any time to heavy demands, resting upon mere general assurances given by one of its officers, and for ultimate fixation depending upon the testimony of men as to what compensation such assurances would, in their opinion, justify. It is clear to me that the “ open purchase ” mentioned in the statute was intended to be a bargain and sale for a price agreed upon at the time; not an indefinite and un-ascertained compensation for extra trouble and expense, to be thereafter settled either in such a suit as this or iu the more exceptionable mode of a departmental decision based on ex-jparte evidence.
In point of fact, notwithstanding the terms of the petition, this suit is not for the price of the beef sold and delivered by the claimants. For that beef they have been paid cents per pound, which was the contract price. They now claim more, not having been specifically agreed upon between them and the Government officers, but as a quantum meruit based on the verbal assurance of Captain Mackenzie, given by the authority of the commanding general, that a just compensation should be made to them for extra trouble, expense, and risk. Neither that officer nor the commanding general had, in my opinion, any authority to bind the Government by any such assurance. If it was worth more than the contract price to furnish beef to meet the emergency, it was very easy for the parties to have agreed upon the price to be paid for the beef furnished for that occasion; and that price the claimants could probably have recovered here without difficulty. But when they accept the contract price, and claim an indefinite amount more under a verbal understanding with the commissary, they must show his legal authority to bind the Government in that way. In my judgment no such authority existed, and, therefore, there can be no recovery here based on any such understanding.
That there was a contract price for the beef furnished by the claimants, there can be no doubt. The petition avers that the 503,361 pounds of beef delivered to the army were “ of the qual *310 ity stipulated for f and there is no evidence of any stipulation as to quality but that contained in the written contract between the claimants and Captain Mackenzie, commissary of subsistence, entered into on the 1st of February, 1862. In that contract it is stipulated that the beef should be of “ good and wholesome quality.” And by the same instrument it was further agreed that the claimants should £t receive 6J cents per pound for every pound of fresh beef delivered and accepted under this contract;’7 and for cattle with which they accompanied the army on its march they should, “for the additional expense and rislc of property thus incurred, receive an additional one cent per pound for all the heef thus foirnished to said expedition, counting it at 7J cents per pound from the first movement until the circumstances lessening the expense admit of reduction to contract price of 6 J cents per pound.7’
The officer who entered into this contract with the claimants testifies that all the beef delivered by them was delivered and accepted under this contract; and it appears that the claimants were paid for the 362,711 pounds in question the extra price of cents per pound, and received the money without protest or demur. Under the rulings of the Supreme Court this concludes them from asserting here any further claim. — United States v. Child, (12 Wallace, 232;) Mason v. United States, decided at December term, 1872.
With these remarks I dismiss that portion of the case which relates to the extra compensation promised by Captain Mackenzie to the claimants, and proceed to the other matters of claiih which, without being specified in the petition, were set up at the trial and enter into the judgment of the court.
The majority of the court are of the opinion that, in addition to the extra compensation of 3 cents per pound upon the 362,711 pounds of beef delivered by claimants, and for which vouchers were issued and payments made to them, making an aggregate of $10,881.33 of extra compensation, they should have judgment for the following causes of action and sums :
1. Nine head of cattle lost at Franklin, 700 pounds each, at 10£ cents per pound... $661 50
2. Fifty-seven head stolen near Moorfield, at same weight and price..... 4,189 50
*311 3. Forty bead killed near Wardensville, at same weight and price. 12,940 00
4. Nineteen bead captured at Winchester by the enemy, at same weight and at the price of V¿ cents per pound. 997 50
5. Forty-two bead taken by General Cooper, at same weight and price as the last. 2,205 00
12,994 00
Bess $13 per head for hides and tallow.. . 2,171 00
Leaving balance of. 10, 823 00
As to the third of these items, I am of opinion that the claimants are entitled to payment for the forty head of cattle slaughtered near Wardensville under military order, and for which vouchers were never delivered to them. When the cattle were so slaughtered, I would regard them as legally delivered to the army, and the claimants as entitled to be paid for the beef, and would allow them for 700 pounds for each of the forty head, at 7-1 cents per pound, making in the aggregate $2,100.
But as to the remaining one hundred and twenty-seven head, I can see no ground upon which this court has jurisdiction of any claim against the United States, in this action, for cattle which were either lost, or stolen, or captured by the enemy; nor, if it had jurisdiction of such a cause of action, do I con-, sider a case made out which will justify any judgment against the Government.
If those cattle had not been delivered to the Government before they were lost, stolen, or captured, then there can be no recovery for them in an action for the • price of beef delivered to and received by the army.
If they had been delivered to the Government, then they were the property of the Government, and the claimants cannot sue the Government for the loss, theft, or capture of property which belonged to it and not to them.
The difficulty presented by these plain propositions is not removed by the finding of the fact that all the cattle which the claimants drove to the army were, by the fact of their being so driven, taken into the possession and under the control of the *312 army, so as to constitute a delivery of them, to the United States; for at the same time the further fact is found that the employés of the claimants remained with the army and-accompanied it on its march to drive the cattle and slaughter them, as beef was needed for the army, and according to orders given for the purpose. The latter fact is inconsistent with the idea of a delivery accomplished; for if there had been a delivery, there was no more occasion for those employés to drive and slaughter the cattle. Contractors do not furnish men to drive and slaughter cattle that belong to the Government, nor does the Government have its own cattle driven and slaughtered by the employés of individuals, but by its own.
In a certain sense it was true that when the cattle were driven by the claimants to the army, they passed into the possession and control of the army. The army could and would prevent their removal, either by the claimants or others, or their being appropriated to any other than army use. But the cattle which were lost, stolen, or captured were, at the time of their loss, theft, or capture, in the direct and immediate custody of the claimants or their employés, and not in the custody of any officer of the Government. There was not, up to that time, any moment when, but for the restraining and controlling presence of the armed power with which they were dealing, the claimants might not have driven their cattle back to the point from which they started, and left the army without beef.
But the contract of the claimants was not to drive cattle to the army, but to supply the army with fresh beef, in quarters; and that could only be done when the cattle were killed, dressed, and quartered.
That contract was to be fulfilled through certain officers of the commissary department of the army, and not through the army itself. When, therefore, the cattle were driven to the .army, it was no delivery of them to the United States, unless they passed into the possession ;and control of the officer charged with the commissariat of the army, so as to make him chargeable therefore to Ms Government.
To me, therefore, no conclusion is more clear than that the one hundred and twenty-seven head of cattle in question were never, in law, delivered to the United States, but were lost, stolen, or captured while still the property and in the posses- *313 siou of the claimants; and that the Government is not chargeable for such loss, theft, or capture.
The only semblance of obligation on the part of the Government in regard to the loss of cattle driven with the army is in the written contract, in these words:
“And should any part of said stock of beef-cattle * * be lost, and the said Evans & Battelle use due and proper diligence to take care of the same, the Government shall pay such portion thereof as may be agreed upon between the parties.”
At the trial the claimants’ counsel, while not invoking that contract for any other purpose, based upon it, and it alone, the right to recover for lost cattle. Let the claimants be held to its terms. It does not bind the United States to pay them for lost cattle, but only'to pay such portion thereof as might he agreed upon between them and the Government. Until such agreement is arrived at, there can be no right of action on account of lost cattle; and as soon as it should be arrived at no action would be necessary, for payment would doubtless immediately ensue.
I feel constrained to extend this expression of my views to the first, second, fourth, and fifth items of cattle lost, stolen, or captured, which are mentioned above.
And, first, as to the nine cattle lost at Franklin. The finding of facts adopted by the majority of the court says:
“While the army of Gen. Frémont was at Franklin, two hundred head of cattle delivered to the army, as above stated by the petitioners, were pastured in a field at night, with the river on one side and fenced on the other side; and the next morning nine of the cattle were missing, and were lost.”-'
I do not see my way clear to charge the United States with this loss. The cattle, when lost, were the property of the claimants or the property of the United States. If the former, they were at the claimants’ risk, and it was the claimants’ business to see that they did not stray away. If the latter, it was nothing to the claimants whether the cattle staid or strayed. They neither gained by the former nor lost by the latter; and it is impossible for me to see how they can, on either theory, maintain a claim against the United States for the value of the beef in the cattle.
Next, as to the fifty-seven head stolen near Moorfield; in re *314 gard to which the facts are found by the majority of the court as follows:
“Between Moorfield and Wardensville, when the army encamped at night, eighty head of cattle were pastured in a fenced field, and under a guard, within the pickets, and inside the camp. Fifty-seven of these cattle were surreptitiously taken by the troops, and slaughtered and used by them. And for these fifty-seven head of cattle no vouchers could be obtained by the petitioners.”
These cattle were either the Government’s or the claimants’. If the former, the claimants cannot make the Government pay them the value of the Government’s own cattle, slaughtered and used, however surreptitiously, by the Government’s own troops. If, on the other hand, the cattle belonged to the claimants, the surreptitious taking and slaughtering of them was a tort for which no action lies against the United States, though it were committed in the service and to promote the interest of the Government. — Gibbons v. United States, (8 Wallace, 269.)
Nest, as to the nineteen head of cattle captured by the enemy at Winchester; in regard to which the majority of the court find the facts to be as follows:
“On the retreat of Gen. Banks from Hamsonburgh he was closely pursued by the confederate forces through Winchester on the 24th of May, and Martinsburgh on the 25th of May, to the Potomac,- which he crossed on the 26th of May. There were-at Winchester nineteen head of cattle, supplied under said written contract Z to the forces of the United States by the petitioners, and which were for the use of the hospital at Winchester. And from the suddenness and hurried manner of Gen. Banks’ retreat, and the closeness of the pursuit by the enemy, it was not possible to save these cattle, which, with their keepers, were captured by the confederates.”
If these cattle belonged to the United States, what right have the claimants to demand pay for their capture % It would seem to be enough for the United States to lose them, without having to pay the value of them to parties who had no title to them. If, however, the cattle were the property of the claimants, I look in vain for any law which authorizes the rendition of a judgment against the United States for the value of private property captured by the enemy in the movements of the war.
Finally, as to the forty-two head of cattle taken by General *315 Cooper j iu regard to which the facts found by the majority of the court are as follows:
“On.the 25th of May, 1862, sixty-five head of cattle, sent by the petitioners from New Creek, under said written contract, for the supply of the Union troops, were received by their agent by railroad near Martinsburgh, and by him pastured in a field near there. On the retreat of Gen. Banks and the advance of the confederates, it was not possible to remove these cattle, as no men could be procured for the service. And these sixty-five head of cattle were captured by the confederates, and on their retreat they drove forty-eight head of these cattle near to Winchester, and left them there, and they were afterwards taken possession of by General Cooper, commanding the advance of Gen. Sigel’s division.”
Here is no finding of a delivery of the cattle to the Government ; and they unquestionably belonged to the claimants when they were captured by the rebels. By the rebels they were left near Winchester, where they were found by General Cooper, and taken into the possession of his troops, and without doubt appropriated to their use.,
As they went to feed troops of the United States, the claimants ought to be paid for them; but, in my opinion, this court has no jurisdiction of their claim. It was a clear case of appropriation of property by a portion of the Army to its own use; and jurisdiction of any such claim is denied to this court by the Act July 4, 1864, (13 Stat. L., p. 381, ch. 240.) In Filor v. United States, (9 Wallace, 45,) the Supreme Court said, in interpreting that act: “ If the right to the property, or to its use, is not obtained by valid contract with the Government, the taking or use of it is an appropriation of it within the meaning of the act of Congress. * * * If the petitioners are entitled to compensation for the use of the' property, they must seek it from Congress. The Court of Claims can award them none.”
I regret the necessity which appeared to me to exist for this extended expression of the grounds of my dissent. When I am so unfortunate as to differ from my associates, I would ordinarily prefer a simple statement of the fact; but in a case involving such important questions as seem to me to be presented in this, I feel justified in stating my views more extendedly than in any ordinary case might be expedient.